995 F.2d 1066
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James H. DAVIDSON, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 92-6170.
 United States Court of Appeals, Sixth Circuit.
 June 14, 1993.
 
 Before: GUY and SUHRHEINRICH, Circuit Judges; and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Claimant, James Davidson, appeals from a denial of social security disability benefits.[1] After a complete review of the record, we conclude that substantial evidence exists to support the Secretary's denial in part, but that a remand is necessary to further develop the record on one issue.
 
 I.
 
 2
 This 33-year-old claimant has a history of nocturnal seizure episodes dating back to 1978 or earlier. In September of 1978, he came under the care of Dr. Michael Winsor, a neurologist. Davidson's neurological exams, skull x-rays, and EEGs were all normal. No specific cause for the seizure activity could be determined, although there is a family history of seizures. Davidson was placed on Dilantin, which he tolerated well, and it generally controlled his seizures. Claimant stopped seeing Dr. Winsor in 1980 and did not return until 1987. During the interim, Davidson was more or less continuously employed and the seizure activity was controlled. Although he had some seizure activity in 1987, it was at a time when his Dilantin level was subtherapeutic. The Dilantin dosage level was increased, and Davidson was seizure free until 1989.
 
 
 3
 In 1990, claimant again returned to Dr. Winsor and complained that he was not tolerating the Dilantin well. In April 1990, he was taken off Dilantin and placed on phenobarbital.
 
 
 4
 In July of 1990, at which time Davidson had filed for disability benefits, Dr. Winsor was asked by Davidson's attorney to furnish an evaluation report. This report stated, in pertinent part:
 
 
 5
 In my opinion, the patient does have a generalized seizure disorder and does require medication for this. In my opinion, the patient is disabled for doing any type of work in which he would injur[e] himself if he would have a seizure such as driving a motorized vehicle, working at heights in which he could fall and hurt himself or working around motorized machinery and fall into. If the patient can go for greater than 12 months without a seizure on medication, then these restrictions can be lifted at that point. As you see, the vocation of a truck driver in a patient with tendency towards seizures would not be a good idea.
 
 
 6
 (App. 157).
 
 
 7
 If we were to stop our analysis at this point, we clearly would have to hold for the Secretary, since the treating physician indicated that claimant's medical condition results in job limitations but not disability, as that term is defined for social security benefits purposes.
 
 
 8
 At this point in time, however, claimant's attorney referred him to a psychiatrist, Russell D. McKnight, M.D. Dr. McNight's findings are summed up as follows:
 
 
 9
 Clinical Impression: Mr. Davidson's primary diagnosis is of a Seizure Disorder of the Grand Mal Type. He also demonstrates cognitive impairment due to cognitive slowness of a moderate to severe degree. He is also subject to recurrent dysthymic reactions and labile moods and his wife describes a sleep disorder with episodic insomnia and hypersomnia.
 
 
 10
 His psychiatric problems are secondary to and consistent with a diagnosis of seizure disorder and may in part be due to the sedative medications required for control of his epilepsy, that is Phenobarb. In this case treatment for his epilepsy is primary and he is not likely to benefit much from psychiatric intervention. Neither he nor his wife feel any need for individual or family counseling.
 
 
 11
 (App. 177).
 
 
 12
 Dr. McNight also completed a medical assessment form in which he evaluated, from a psychiatric perspective, Davidson's ability to perform work related mental activities. The doctor indicated that claimant's ability to follow work rules, relate to co-workers, and interact with supervisors was fair; his judgment was good, but his ability to deal with the public, endure stress, and function independently were all rated as poor.
 
 
 13
 A second examination one month later with a consulting clinical psychologist, Andra R. Savage, resulted in a finding that:
 
 MEDICAL ASSESSMENT
 
 14
 The patient has the intellectual ability to perform simple one- and two-step job instructions, as well as more detailed job instructions in line with his intelligence. He interacts appropriately with this evaluator in the office today and is likely to have no difficulty in interacting appropriately in the standardized work setting. There was no impairment noted in this abilities to maintain attention and concentration.
 
 DIAGNOSIS
 
 15
 The patient reports in the office today seeking disability associated with his seizure medications, as well as his nerves. There is no evidence of any anxiety in the patient's presentation in the office today, nor does there appear to be any significant anxiety in the patient's history. From an intellectual standpoint, the patient is functioning within the High Borderline range.
 
 
 16
 (App. 183-84). These conclusions were reached after a battery of tests were conducted. Dr. McKnight's conclusions were reached without testing.
 
 
 17
 Once again, if we were to stop at this point, we would have to conclude that the findings of Andra Savage would provide substantial evidence supporting the Secretary's conclusion that claimant is not disabled from a psychiatric standpoint. Two other issues remain, however.
 
 
 18
 Since it is undisputed that claimant can no longer do his past relevant work, the Secretary has the burden of demonstrating that other work, which claimant has the residual functional capacity to perform, exists in the national economy. To meet this burden, a vocational expert (VE) was called as a witness and responded to hypotheticals put before him by the ALJ. The first hypothetical presented the picture of claimant with job restrictions due to his seizure disorder and with the non-exertional limitations evidenced by his psychiatric evaluations. The response of the VE was as follows:
 
 
 19
 Q ... Are there any jobs that exist in the region or in the national economy that this person can perform?
 
 
 20
 A Yes, I believe there would be jobs that he could perform with those limitations. I think, I think the best example of the kind of job he could perform would be bench work jobs, where you'd work at a table performing various kinds of duties. I think there would also be jobs that fall under a general category of material handler. They would be carrying weights of various items. In, in a lot of factories, they would be carrying trays of small parts to assembly lines, keeping the lines stocked with the goods, removing the items from the end of the assembly line. There would be, there are a number of people in factories that take, actually package the items, such as, oh, electric heaters, for example. They put them on wagons or carts and would haul them from the area where they're assembled back to the area of the building where they're prepared for shipping and loading, back to the dock area. But I think these would be examples of jobs that he could perform with these limitations.
 
 
 21
 ....
 
 
 22
 Q If I find that the claimant has a mild to moderate emotional disorder, could he perform the jobs that you've enumerated?
 
 
 23
 A Yes, I think so.
 
 
 24
 Q If they're greater than moderate, could he perform these jobs?
 
 
 25
 A No, I don't believe he could.
 
 
 26
 Q Any other jobs?
 
 
 27
 A I don't think so.
 
 
 28
 (App. 47-48).
 
 The VE was then asked a final question:
 
 29
 Q ... If I find that he's unable to tolerate an 8-hour workday, could he perform these jobs?
 
 
 30
 A No, I don't think he could do these, practically all of these jobs would require an individual to work for an 8-hour shift, and if he's unable to do that, I don't think he could perform these jobs.
 
 
 31
 (App. 49).
 
 
 32
 This brings us to the final question for resolution: Can claimant work an eight-hour day? We already have indicated that insofar as his seizure disorder and his psychiatric non-exertional limitations are concerned the answer is "yes." However, claimant argues that it is his medication and the effects thereof, principally extreme drowsiness, that would keep him from being gainfully employed.
 
 
 33
 The ALJ did not address this issue in his report, nor does he explain explicitly or implicitly the answer of the VE to his question about the ability of Davidson to be employable if he cannot get through an eight-hour shift due to his medication. Since the ALJ's report was otherwise very complete and well written, we are troubled by this omission. As was noted in Varney v. Secretary of Health and Human Servs., 846 F.2d 581 (9th Cir.), modified to require immediate payment of benefits, 859 F.2d 1396 (1988):
 
 
 34
 The ALJ noted that Varney takes various medications and acknowledged her testimony as to their side effects. He did not, however, make any findings with regard to the side effects....
 
 
 35
 Like pain, the side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process. Also like pain, side effects can be a "highly idiosyncratic phenomenon" and a claimant's testimony as to their limiting effects should not be trivialized. Therefore, if the Secretary chooses to disregard a claimant's testimony as to the subjective limitations of side effects, he must support that decision with specific findings similar to those required for excess pain testimony, as long as the side effects are in fact associated with the claimant's medication(s).
 
 
 36
 846 F.2d at 585 (citations omitted).
 
 
 37
 We conclude a remand is necessary for additional medical testimony on this point. We note in this regard that encompassed within this further review is the necessity to determine whether claimant needs to stay on phenobarbital, if in fact it has the debilitating effect on him to which he testified. We note in this regard, at the risk of entering the domain of the medical profession, that Dr. Winsor's report and notes seem to indicate that Davidson was taken off Dilantin more so to accommodate him than for medically necessary reasons. Among other things, Davidson complained of painful skin eruptions which he attributed to Dilantin, but which Dr. Winsor felt were not a Dilantin side effect.
 
 
 38
 We also note in this regard that claimant has not been consulting with a doctor, and the record does not reflect he has ever gone back to Dr. Winsor to discuss the drowsiness problem.
 
 
 39
 The Secretary's decision is AFFIRMED, except for a limited REMAND for the purpose of determining the effects of Davidson's medication on the issue of disablement.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Since claimant's insured status expired on September 30, 1989, there also is a claim for supplemental security income benefits